UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BARRY L. GOUGER, ET AL. | § | |
| | § | |
| V. | § | CA. NO. 6:10-CV-18 |
| | § | |
| U.S. ARMY CORPS OF ENGINEERS, | § | |
| ET AL. | § | |

**ORDER**

On this day came on to be considered Plaintiffs' Motion for Summary Judgment
(D.E. 38) and Federal Defendants' Motion for Summary Judgment (D.E. 37).  For the
reasons stated herein, Plaintiffs' Motion for Summary Judgment is DENIED (D.E. 38)
and Federal Defendants' Motion for Summary Judgment is GRANTED (D.E. 37).

**I.      Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331 (federal question), as this action arises under the Administrative Procedure Act, 5
U.S.C. § 701-706, the Clean Water Act, 33 U.S.C. § 1251, et seq., and the National
Environmental Policy Act, 42 U.S.C. § 4321, et seq.

**II.     Factual Background**

This lawsuit is the latest development in a long-running dispute between
Plaintiffs, the Army Corps of Engineers, and Mr. Jay Lack, who first sought a permit in
2002 to develop his property along the Gulf Intracoastal Waterway ("GIWW").  Plaintiffs
are property owners in the Dolphin Point Subdivision in Port O'Connor, Texas, which is
located across the street from the property at issue.[1]  Defendants are (1) the U.S. Army

---

[1] Plaintiffs in this action are Barry L. Gouger and Denese G. Burton; Samuel G. and Susan H. Moseley;
Clifton L. Thomas Jr. and Cathy S. Thomas; David G. Nunn; Fred Eppwright; John and Linda Gustainis

Corps of Engineers (the "Corps"), (2) Colonel Christopher W. Sallese, who is sued in his official capacity as District Engineer of the Galveston District of the Corps, (3) Lieutenant General Robert L. Van Antwerp, who is sued in his official capacity as Commander and Chief of Engineers of the Corps, and (4) John M. McHugh, who is sued in his official capacity as the Secretary of the Army.  (D.E. 30 at 4-5.)

### A.    2003 Permit

In May 2002, the Corps received an application from property owner Jay Lack (the "Applicant") for a Department of the Army Permit ("DA Permit") to "provide waterfront marine docking and service facilities" on property adjacent to the GIWW in Port O'Connor, Calhoun County, Texas (the "Property").  (A.R. 292-293; 419.)[2]   The Applicant proposed to fill wetlands under U.S. Environmental Protection Agency ("EPA") guidelines, consistent with Section 404 of the Clean Water Act, 33 U.S.C. § 1344.   The application stated, "[a]pproximately 0.59 acres of area meeting the criteria of wetland would be filled.   The Applicant is proposing 1:1 compensation for wetland impacts.   The action also includes filling 0.16 acres of tidal waters for recovery of private property lost to erosion from dredging of the intercoastal [sic] canal and associated marine traffic."   (A.R. 293.)    Three hundred ninety feet of bulkhead would also be constructed under the proposal.   (A.R. 547.)

The Corps issued a public notice regarding the permit application on March 18, 2003.   (A.R. 446-454.)   Certain residents of the Dolphin Point subdivision, including Plaintiff Glenn Ralston, voiced their objection to the original permit.   Mr. Ralston stated,

---

and Frank Krenek; Louis and Rhonda Bratton; Glenn and Dorothy Ralston; Russell Brhlik and Chyrl Lowe; and Dan and Sandy Benak.
[2] Citations to "A.R." are to the Administrative Record, filed with the Court on December 13, 2010.   (D.E. 32.)

"I strongly oppose any development of the wetland area involved in the Application No. 22722 for the simple reason that the fish and wildlife will be misplaced from their natural habitat. . . .  I see no reason, nor, do I see any public advantage to be had by developing a pristine area for private gain. . . .  There is no amount of off-site mitigation that can replace the damage that will be done to this wetland area as well as to the people who are fortunate enough to see the wildlife and sea creatures in their natural environment." (A.R. 463; 469.)    The Corps determined in its 2003 Environmental Assessment / Statement of Findings ("EA/SOF") that the project was needed to meet demands for new docking facilities in light of increased growth in the area.  (A.R. 518.)

DA Permit 22722 was issued to Jay Lack on November 13, 2003, permitting the construction of a commercial waterfront marina and docking facility.[3]   (A.R. 547-559.) The work authorized under the Permit was to be completed by December 31, 2008. (A.R. 547.)  The Permit was issued under the authority of the Rivers and Harbors Act, Section 10, 33 U.S.C.§403, and Clean Water Act, Section 404, 33 U.S.C.§1344.  (Id.)

**B.     Pelican Landing**

Plaintiffs contend that, contrary to the Permit's authorization and contrary to Mr. Lacks' representations to the Corps, a residential development named "Pelican Landing" was advertised on the Property as early as 2005 or 2006.  (See, e.g., A.R. 296-297; A.R. 729-763.)[4]    No authorization for such development, however, had been sought. Plaintiffs, through counsel, sent the Corps a letter dated April 17, 2006, asking it to

---

[3] The permit authorized construction of a 390 foot bulkhead and the backfilling of approximately 0.59 acres of irregularly flooded tidal wetlands adjacent to the GIWW.  Three piers were also authorized under the River and Harbor Act, with each pier consisting of a 4 x 67 foot long pier with a 6 x 48 foot T- Head. (A.R. 518.)
[4] Plaintiffs, including Fred Eppright, also complained that Mr. Lack was "exceeding the scope of his Department of the Army Permit and constructing a bulkhead farther out into the water and by using unsuitable fill material."  (A.R. 764.)  The Corps investigated, and found no violation.  (A.R. 765, 766.)

revoke Permit 22722, due to Mr. Lack's alleged non-compliance with its terms.  (A.R. 775-777.)   The Corps responded on April 24, 2006, stating that it was investigating the matter.  (A.R. 779.)  The Corps sent Mr. Lack a letter dated April 28, 2006, in which it informed him that his permit was for a marine docking facility, not residential housing. The Corps stated that Mr. Lack's recent activities constituted a change in the project, and meant that the work he was planning to do was not in compliance with the Permit.  The letter also noted that Mr. Lack had not yet begun the required mitigation work (ie, construction of replacement wetlands), also in violation of his permit.  (A.R. 780-781.) Mr. Lack responded, stating that mitigation would be completed by November 15, 2006, and that changing economics caused him to change the project from a marine docking facility to residential homes.   He explained that the change was "the only way [to] alleviat[e] the large tax burden [he] is now having to undertake and be able to recoup [his] expenses in what was going to be a marine docking facility . . . . Due to these economic factors, the project as originally planned can no longer be profitable, thus creating a financial hardship for [him]."  (A.R. 787-788.)

Thereafter, on May 2, 2006, Plaintiffs' counsel, Blackburn Carter, issued a Notice of Intent to Sue ("NOI") regarding Permit 22722, pursuant to the Clean Water Act, 33 U.S.C. § 1365(a)(1), (b)(1)(A).  This NOI informed the Corps that Lack was not building a marina and T-Head piers, but rather a residential development, and such a subdivision was not water-dependent.  (A.R. 303-337; A.R. 565-568.)  The Corps responded on June 29, 2006, stating that Lack had "voluntarily agreed to bring his project into full compliance with the terms and conditions of Permit No. 22722, so as to complete the original, authorized purposes of constructing a bulkhead and marine facilities."  (A.R.

299-300; 572-573.)   Mr. Lack had previously written to the Corps on June 9, 2006, confirming that "we are in the process of completing our permit 22722 as originally proposed.  We are removing the for[] sale sign.  I am going to refund and transfer title back to the group . . . ."  (A.R. 301; A.R. 569.)  The Corps accepted Mr. Lack's representations.  (A.R. 797-798; A.R. 832-833.)

A few months later, on September 6, 2006, the Corps sent another letter to Mr. Lack, inquiring into the progress of the required mitigation work.  The Corps requested that Lack provide it with "an explanation for the delay in starting the mitigation project, how [Mr. Lack] will deal with this problem(s), and a timetable with <u>specific dates</u> for getting this project completed."  (A.R. 801-803.)  Mr. Lack responded the next day, explaining that the delay was due to logistical issues such as problems locating equipment, and promising to begin the work on September 19, 2006, completing it no later than October 1. (A.R. 805-814.)   Placement of fill into the wetlands pursuant to Permit 22722 and construction of the bulkhead was completed in 2007.  The required mitigation occurred in November 2006, when Mr. Lack planted the area with smooth cordgrass (<u>Spartina alterniflora</u>), and the site was replanted in late 2008.  (A.R. 366-367.)

### C.    2009 Revised Application

On January 9, 2007, Mr. Lack wrote to the Corps formally requesting a modification of Permit 22722.  He explained the reasons for his requested modification as follows:

> Due to circumstances beyond my control, which have caused economic and financial hardship to me, I am writing to request a change of use for the [property]. . . . Current conditions have made the original intended use of the site as a marine docking facility unfeasible at this time.  Offshore oil companies have left Port O'Connor, or gone to using helicopters to reach their platforms.  This was one of the main targets I was going for in

construction of the marine docking facility.  The area covered by water adjacent to my land is also considerably shallower than we had originally thought, therefore making it more dangerous for offshore boats to dock. Calhoun County has also had a significant rise in taxes over the last three years, which was unforeseen by everyone in the County. . . .

There is a shortage for residences with waterfront access.  These are the reasons I am seeking a change of use.  **What I propose is for seven single family residential lots to be allowed on the . . . property**.  Each lot owner would be allowed to build a single family residence with permanent docking for their boat(s).  [This would] reliev[e] me of the financial hardships I have incurred in constructing the project as authorized under permit 22722. . . .

The significant difference would be the addition of seven permanent structures which would actually help the aesthetics of the area . . . . I see this as nothing but positive for this and neighboring areas.  (A.R. 01-02 (emphasis added).)

On April 17, 2007, Mr. Lack submitted his request for modification, in which he stated that the project purpose was "to provide waterfront lots for residential homes."  (A.R. 028.)  Mr. Lack also requested permission to retain the three piers authorized under Permit 22722.  (A.R. 85.)

On July 3, 2007, public notice was issued regarding the proposed modification (Permit No. SWG-2007-00218) (A.R. 137).  Several members of the community, including Plaintiffs Sam Moseley, Fred Eppright, Dan Benak, and Glenn Ralston sent letters to the Corps in July 2007, protesting the permit modification.  (A.R. 0101-131; 133-136; 138-139; 140-143; 149-150; 152.)[5]  Law firm Blackburn Carter also submitted

---

[5] Earlier, in April 2007, Plaintiff Sam Moseley had sent an e-mail to Thelma Jaynes at the Corps regarding the proposed Pelican Landing community.  Moseley stated in part:

[W]e inadvertently learned that Mr. Lack had submitted request to Ms. Janet Thomas Botello asking that his permit be amended to allow residential use of the property.  We now have copy of his letter which was provided to our lawyers by Ms. Botello.  In his letter he cites change of economic conditions as reason why his request should receive serious consideration.  Arguably economic conditions have changed very little since the granting of his permit and offshore oil and gas exploration and production activities are at their historically highest level.  The fact is Mr. Lack has been disingenuous with the Corp

a letter on behalf of the Dolphin Point Homeowners Association.  (A.R. 146-148.)  The Texas Department of Parks and Wildlife ("TDPW") issued a letter dated August 7, 2007 to the Corps regarding the permit modification, in which it "request[ed] that the Corps not authorize this permit until additional information is provided to resource agencies for review and comment.  The Corps should ensure that the applicant has complied with all conditions of the original permit prior to issuing the modification."  (A.R. 0153-154.)  In particular, TDPW questioned Mr. Lack's mitigation efforts.  The U.S. Fish and Wildlife Service also issued a letter to the Corps, recommending that "the project not be authorized as proposed," and the applicant, "(1) Include construction details of the proposed catwalk in the project plans, (2) Obtain a conservation easement for the mitigation area, as required in Permit 22722, or obtain written verification from the property owner that the mitigation site will be maintained in a protected state, (3) Provide copies of the mitigation site monitoring reports to the Service, including photo documentation, (4) Develop and implement a monitoring plan for the seagrasses in the project area, and (5) Provide copies of the seagrass monitoring plan and subsequent monitoring reports to the Service."  (A.R. 0155-156.)  On August 21, 2007, the Texas Department of Transportation also voiced its opposition, specifically with respect to the "pier construction portion of this permit application," to the extent that it would introduce "new obstructions within the waterway that interfere with navigation."  (A.R. 0159.)  Mr. Lack responded to the various objections on August 31, 2007.  (A.R. 0161-182.)  Throughout 2008, Ms. Jaynes of the Army Corps was in repeated contact with Mr. Lack

_____

of Engineers and never intended to be satisfied with the constraints of commercial permit. (A.R. 033-34.)

regarding the permit modification, addressing issues such as available alternatives, mitigation, and related concerns.  (A.R. 187-253.)

In March and April 2009, various homeowners in the Dolphin Point subdivision again sent letters to the Army Corps voicing their objections to the permit modification. (A.R. 272-280; 285-288.)   Colonel Weston responded, stating "[w]e continue to require monitoring reports on the success of the mitigation site, and will require corrective action if it is not successful," and "I do not believe this permit has been dealt with outside the normal procedural process.  In both the original permit and the subsequent modification request we have followed our policies and procedures."  (A.R. 289-290.)

In its EA/SOF dated October 27, 2009, the Corps characterized the housing project as non-water dependent, and discussed the economic motives behind the proposed modification.  (A.R. 367.)  The overall project purpose was defined as constructing "waterfront lots for residential homes along the GIWW," and the EA/SOF in part stated that the project would "help relieve the financial hardships incurred during the attempt to construct the marine docking facility and provide a return on [Mr. Lack's] investment in the property."  (A.R. 367.)

The Corps considered several alternative options in the 2009 EA/SOF, which included leaving the present permit in place (the "No Action Alternative"), selling the property to another party for a commercial venture, and locating the proposed residential development at another site.  The Corps rejected to "No Action Alternative" because it would not allow the Applicant to recoup his costs on his investment and it would not prevent impacts to aquatic resources, particularly since the wetlands had already been filled pursuant to the initial Permit.  (A.R. 368)   The Corps determined that the

commercial venture alternative was not viable because the street in front of the property was ruled private property, inaccessible to commercial vehicles.   The Corps also determined the relocation alternative not to be viable.   The Applicant favored changing the use of the permitted activity from a commercial marine docking facility to residential development.   (A.R. 369.)

The EA/SOF included a NEPA analysis, which concluded that there was no significant environmental impact, and determined that an environmental impact statement was not required.   (A.R. 366-382.)   The Corps also found that the amendment was not contrary to the public interest, and that a DA Permit should be issued.   (A.R. 367.)   The 2009 EA/SOF was signed by Kevin Morgan, Chief Evaluation Section.   (A.R. 393-406.)

On October 27, 2009, Janet Thomas Botello, Leader, Central Evaluation Unit for Colonel David C. Weston of the Army Corps signed Mr. Lack's permit modification. (A.R. 393-406.)[6]   The Corps sent letters to the interested parties after the permit modification was issued.   (A.R. 409-412.)

### D.      2010 Amendment: Request for Additional Modifications

On March 1, 2010, Mr. Lack submitted to the Corps yet another modification request.   (A.R. 584.)   The modification sought to change the width of the outside two fingers of each pier from 2 feet to 3.5 feet.   The inside pier would be removed and replaced with two mooring pilings, and a step would be added at the base of each T-Head, so that each finger would be dropped up to 1.5 feet.   Each boathouse would be covered by a 50 x 30 foot roof, with a 4 foot hang down.   (A.R. 597.)

---

[6] The permit modification only allowed for six single family homes rather than seven.  (A.R. 393.)  This distinction is not relevant to this analysis.

On June 9, 2010, an interagency coordination notice for the permit modification was issued (A.R. 597-603), and the U.S. Fish and Wildlife Service ("USFWS") submitted a June 24, 2010 email stating that they had concerns regarding impacts upon navigation, namely the "proposal to locate boathouses immediately adjacent to the GIWW." (A.R. 618-619.) The TDPW responded on June 15, 2010, making several recommendations including those designed to avoid impacts upon seagrass beds and wetlands. (A.R. 613-616.) Plaintiffs' counsel also made comments, stating that Lack was exploiting loopholes to circumvent requirements for water dependent activities and concluding that "[t]his permit has been a sham from the beginning." (A.R. 620-622.) Fred Eppright and other homeowners commented, this time expressing more frustration, and claiming that the Corps "has no intention of listening to logical and factual input on this matter. I am convinced that Mr. Lack will be granted any modification or permit he requests. This is now a matter for the courts to decide." (A.R. 612; 617.)

The Corps issued an EA/SOF on August 2, 2010, finding that "there have been no identified significant environmental effects related to the proposed modifications; that the issuance of this permit is consistent with National policy, statutes, and administrative directives; and that on balance, it would not be contrary to the public interest to issue a Department of the Army permit for the proposed work." (A.R. 685-690, 689.) The Corps issued the permit modification that same day. (A.R. 707-713.)

Plaintiffs report that the three piers have been constructed on the Property, but the residential housing portion of the project has not yet been initiated. (D.E. 38 at 16.)

### E.   Lawsuit

Displeased with the Corps' decisions in this matter, Plaintiffs filed suit on August 24, 2010.  (D.E. 1.)  In their most recent Complaint, filed October 15, 2010, Plaintiffs state three causes of action.   First, they contend that Defendants violated Section 404(b)(1) of the Clean Water Act, because the Corps did not properly consider practical alternatives.  Plaintiffs argue that relieving a permit applicant's "financial hardship and providing a return on his investment in the property" is not an accepted regulatory rationale to support a project.  (D.E. 30 at 14-16.)   Second, Plaintiffs allege that Defendants failed to fully consider all alternatives, including the "no action alternative," as well as relocation and restoration alternatives.  This was primarily due to the Corps' overly narrow definition of the project purpose of housing "along the GIWW," which artificially constrained the viable alternatives.  (D.E. 30 at 16-17.)  Third, Plaintiffs allege that Defendants failed to properly consider cumulative impacts, consistent with NEPA and its implementing regulations.  Plaintiffs contend that the interpretations at issue in this case are "novel," and if allowed to continue, "numerous instances will occur that will allow wetlands to be filled that should not be filled if the regulations were applied correctly," and this could result in the loss of "substantial acreage of wetlands."  Plaintiffs state that the cumulative impacts at issue here were not properly analyzed.  (D.E. 30 at 18.)

Plaintiffs request that this Court set aside the agency actions at issue here as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the Administrative Procedures Act.  They also request that this Court

find that "recouping a financial investment" is not an appropriate criteria for defining whether or not a practicable alternative exists or not.  (D.E. 30 at 19.)

## III.  Procedural Background

This action was filed on August 24, 2010 in the Victoria Division of the U.S. District Court for the Southern District of Texas, and assigned to this Court after the Honorable John D. Rainey issued an Order of Recusal.  (D.E. 17.)   Plaintiffs filed a First Amended Complaint on October 15, 2010.  (D.E. 30.)  The parties filed cross-motions for summary judgment on January 14, 2011 (D.E. 37, 38), and filed responses on February 4, 2011 (D.E. 39, 40).  Defendants filed a Reply on February 17, 2011, addressing solely the issue of Plaintiffs' standing.  (D.E. 43.)

## IV.  Discussion

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case."  Rivera, 349 F.3d at 247.  The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment").

Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party.  Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).  The parties here agree that issues of law, appropriate for resolution on summary judgment, are present in this case.

### B.    Plaintiffs' Standing to Challenge the Permit Modification

Before turning to the substance of the parties' dispute, the Court first addresses Defendants' argument that Plaintiffs have not demonstrated their standing to challenge the 2009 permit modification.  (D.E. 37 at 17; D.E. 43.)   The Court first reviews the applicable law, then considers the parties' arguments.

### 1.    Applicable Law

Under Article III of the U.S. Constitution, the federal judicial power is restricted to "Cases" and "Controversies." U.S. Const. Art. III, § 2. Under Article III, "the irreducible constitutional minimum of standing contains three elements." Lujan v.

13

Defenders of Wildlife, 504 U.S. 555, 560 (1992).  These elements are "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." Croft v. Governor of Texas, 562 F.3d 735, 745 (5th Cir. 2009) (citing Lujan, 504 U.S. at 559-560).  As "the party invoking federal jurisdiction," the plaintiff "bears the burden of establishing these elements." Lujan, 504 U.S. at 561. The plaintiff must meet this burden "with the manner and degree of evidence required at the successive stages of the litigation." Cornerstone Christian Schs. v. Univ. Interscholastic League, 563 F.3d 127, 133-34 (5th Cir. 2009) (quoting Lujan, 504 U.S. at 561).  "When the defendant moves for summary judgment because of lack of standing . . . the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue." Ass'n of Comm. Orgs. for Reform Now v. Fowler, 178 F.3d 350, 357 (5th Cir. 1999).

### 2.    Analysis

#### a.    Injury in Fact

Defendants appear to challenge the traceability of Plaintiffs' injuries and redressability, rather than the injury itself.  In essence, they contend that any injuries that Plaintiffs suffered resulted from Permit 22722 (the original permit), not Permit SWG-2007-00218 (the modification).  Plaintiffs, however, are barred from challenging Permit 22722 as the statutory period has expired.  (D.E. 37 at 18-19.)   Plaintiffs respond that they satisfy the injury requirement because they will suffer "direct injury to their environmental, aesthetic, and recreational interests." (D.E. 39 at 10.)   Plaintiffs Gouger, Brhlik, and Moseley submit declarations detailing how they use and enjoy the

environment surrounding their homes, and how the actions at issue in this litigation will negatively impact them.  (D.E. 39 at 9-10; D.E. 39-1, 39-2, 39-3.)  Although the Court interprets Defendants' argument more as a challenge to traceability (or causation) than injury in fact, it briefly considers Plaintiffs' injuries.

In Lujan, the Supreme Court stated that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  Lujan, 504 U.S. at 562.   The Court recognized that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing. But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."  504 U.S. at 562-63.  Later, in Friends of the Earth, the Court stated that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), 528 U.S. 167, 183 (2000).

Here, Plaintiffs have submitted three declarations demonstrating injury in fact. Barry Gouger states that he spends approximately 40% of his time at his Dolphin Point home with his family, that he enjoys "fishing and water sports," and observing dolphins, birds, and other wildlife in the water and marsh along the GIWW.  He also states that these activities will be negatively affected if the permit modification is allowed to stand and the houses are constructed.  (D.E. 39-1 at 1-3.)  Plaintiffs Russell Brhlik and Samuel Moseley also submitted declarations, making similar statements of injury.  (D.E. 39-2,

39-3.)  These statements sufficiently satisfy the injury in fact requirement, as Plaintiffs "aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  <u>Friends of the Earth, Inc.</u>, 528 U.S. at 183.

<b>b.      Causation</b>

Defendants argue that Plaintiffs' injury is not "fairly traceable" to Defendants' actions, as Permit SWG-2007-00218 was "issued long after the wetlands on the project site had been filled and mitigated under the authority of the prior, unchallenged permit (Permit 22722)," and Plaintiffs' real dispute lies with Permit 22722, which cannot be challenged due to expiration of the limitations period.  (D.E. 37 at 18-19; D.E. 43 at 2-3 ("None of the injuries claimed by Plaintiffs can be traced to the decision to grant Mr. Lack the authority to construct residential homes as opposed to a waterfront marina.  The aesthetic and recreational interests that Plaintiffs claim are harmed by residential homes would have been harmed just as much by a busy commercial marina, if not more so.").)  Plaintiffs respond that they have satisfied the "fairly traceable" requirement because they are challenging a "final agency action" in Permit SWG-2007-00218, which is the "consummation of the agency's decision-making process."  Also, it is the issuance of the modified permit that has authorized Mr. Lack to build his residential development, causing injury to Plaintiffs.   (D.E. 39 at 10-12.)

The proper reference for causation is the final agency action.  The "final agency action" is one that "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  <u>Bennett v. Spear</u>, 520 U.S. 154, 177 (1997).  As one court has

16

explained, a plaintiff must "demonstrate a causal relationship between the final agency action and the alleged injuries." Center for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1160 (D.C. Cir. 2005). The agency action at issue here is a culmination of all permits and revisions issued in this action; the Court does not see any reason to deny standing based upon the fact that Plaintiffs here challenge the modification to Permit 22722 rather than the original permit itself. The modification is still a final agency action, which would result in injuries to the Plaintiffs, in the form of the construction of a housing development.

Defendants argue that Plaintiffs were injured by Permit 22722 and not the later modification because, "[d]uring the period of time when Permit 22722 authorized Mr. Lack's project, Plaintiffs presumably suffered all the injuries they claim to suffer now, yet they allege that their injuries arose from the issuance of Permit SWG-2007-00218 because it authorized the construction of residential houses as opposed to a commercial marina," and even without the modification, Lack would "still have been authorized to construct a commercial marina." (D.E. 43 at 4.) This argument ignores certain relevant considerations. First, it is reasonable to conclude that Plaintiffs could suffer different or additional injuries from the construction of residential homes rather than a commercial docking facility – these injuries may include an obstructed view, increased permanent population in the area, and other concerns. Regardless, the mere fact that Plaintiffs' alleged injuries with respect to the modified permit may resemble those at issue in the original permit does not of itself divest them of standing. More importantly, Defendants' argument ignores the fact that Mr. Lack sought the modification in the first place because the marine docking facility was no longer economically viable; without the modification,

it is likely that Lack would not construct anything on the Property.   Thus, the modification (as opposed to the original permit) would directly injure Plaintiffs because it would enable Mr. Lack to build on the Property when he otherwise was unlikely to do so. Plaintiffs' stated injuries are therefore fairly traceable to the agency actions at issue in this case, namely the issuance of the permit modification.

**c.**      **Redressability**

Finally, Defendants contend that Plaintiffs have not demonstrated redressability because the wetlands at issue have already been filled pursuant to Permit 22722, no additional discharges are authorized by Permit SWG-2007-00218, and the mitigation at issue is "even more valuable" than the originally planned mitigation process.  (D.E. 37 at 19.)  Plaintiffs respond that their requested relief will redress their injuries, as this relief may lead the Corps to determine that the Applicant's "preferred alternative" is not a practicable alternative.  (D.E. 39 at 11-13.)  Further, the proposed residential housing project has not yet been constructed, or even started.  (D.E. 39 at 13.)

The Court finds that the redressability element of standing is satisfied.   To establish redressability, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc., 528 U.S. at 181.  The Supreme Court has also explained that the relevant question is simply "whether a plaintiff personally would benefit in **a tangible way** from the court's intervention." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 n.5 (1998) (internal quotation marks omitted; emphasis added).  Here, because the residential housing development has not yet been constructed, a favorable outcome in this Court could have an important impact for Plaintiffs.  As Plaintiffs would most certainly "benefit in a tangible way from

the court's intervention," <u>Steel Co.</u>, 523 U.S. at 103 n.5, they satisfy the redressability requirement.

Summarizing the more detailed issues of standing discussed above, the Supreme Court recently clarified, "[a]t bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." <u>Massachusetts v. E.P.A.</u>, 549 U.S. 497, 517 (2007).  If nothing else, Plaintiffs' strong interest in this case is demonstrated by their letters to the Corps over a period of several years, and their desire to protect the habitat near their homes.  (<u>See, e.g.</u>, A.R. 101-131; 133-136; 138-139; 140-143; 149-150; 152.)  It is beyond doubt that Plaintiffs have a sufficient "personal stake" in this case to have standing to present the important issues in this case to the Court.   The Court therefore denies Defendants' request to dismiss this lawsuit due to lack of standing.  The Court now turns to the merits of the dispute.

### C.   Merits

#### 1.   Administrative Procedures Act

The Administrative Procedures Act ("APA"), 5 U.S.C. § 706, governs district court review of federal agency decisions.  Section 706 provides, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) **arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with**

**law**." 5 U.S.C. § 706 (emphasis added).  "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."  Id.

As the Fifth Circuit has explained, "[t]he arbitrary and capricious standard is highly deferential, and we must afford the agency's decision a presumption of regularity. We limit our review to whether the agency articulated a rational connection between the facts found and the decision made, and it is well-settled that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.  Although we must conduct a searching and careful review of the administrative record to determine whether the agency acted in an arbitrary and capricious manner, we may not substitute our judgment for the agency's.  **Our mandate is not to weigh the evidence pro and con but to determine whether the agency decision was based on a consideration of relevant factors and whether there was a clear error of judgment**.  Courts will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Hayward v. U.S. Dep't of Labor, 536 F.3d 376, 379-80 (5th Cir. 2008) (internal citations omitted; emphasis added).

> **2.    Whether The Corps Has Acted in Violation of the Section 404(b)(1) Guidelines**

Plaintiffs argue that the Corps' decision to issue the Permit modification in this case is a violation of the Section 404(b)(1) guidelines, and is therefore arbitrary, capricious, and an abuse of discretion.  They therefore seek to have the Corps' decision vacated.    Defendants argue that they have complied with Section 404(b)(1).  Before turning to the specific arguments, the Court considers the applicable law.

a.        **Clean Water Act Overview**

The Clean Water Act is a pollution control statute that establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a).  The CWA defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include certain wetlands.  33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a)-(b).

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into wetlands through permitting procedures. 33 U.S.C. § 1344.[7]  In addition to passing a public interest review which balances reasonably expected benefits against reasonably foreseeable detriments, all CWA section 404 permits must meet guidelines issued by the Environmental Protection Agency and the Corps under CWA section 404(b)(1).  See 33 U.S.C. §§ 1344(b)(1), 1344(e)(1); 33 C.F.R. pt. 320.4.  These "404(b)(1) Guidelines" specify that the Corps must ensure that the proposed fill will not cause significantly adverse effects on human health or welfare, aquatic life, and aquatic ecosystems. 40 C.F.R. pt. 230.10(c)(1)-(3). To comply with this requirement, the Corps

_____

[7] 33 U.S.C. § 1344(b) provides:

> Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

33 U.S.C. § 1344(b).

must make a written determination of the effects of a proposed activity "on the physical, chemical, and biological components of the aquatic environment . . . ." Id. §230.11.

The 404(b)(1) Guidelines also provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §230.10(d).  Under the Guidelines, a project may generally not be permitted where there is "a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. §230.10(a); see generally City of Shoreacres v. Waterworth, 332 F. Supp. 2d 992, 1015-16 (S.D. Tex. 2004).

With this background, the Court now turns to Plaintiffs' arguments.

### b.      Definition of "Project Purpose"

Plaintiffs contend that the Corps irrationally defined the project purpose too narrowly, namely by defining it as "residential homes along the GIWW" rather than simply "residential homes," and by defining a non-water dependent project purpose (housing) in reference to water accessibility.  They argue that the Corps' definition of project purpose does not bear a rational connection to the facts, and its actions have "created a dangerous loophole," which essentially "allow[s] an applicant to change a project from water dependent to non-water dependent on the same site, but then requir[es] water accessibility for the non-water dependent project."  (D.E. 38 at 24-27; see also D.E. 39 at 14-18.)  Defendants challenge Plaintiffs' assertions as to project purpose, and as to the creation of a loophole.  (D.E. 40 at 6-8, 11-12.)

The project purpose analysis is an important first step in the permitting process. In making a permit assessment, the Corps "must carefully define what it is that the applicant is proposing to do. This process - defining the project purpose is, therefore, a critical first step to the Corps' proper evaluation of practicable alternatives.  Initially, the Corps determines a project's 'basic purpose' to assess whether the activity associated with the project is water dependent[8]. . . .   Where a project's basic purpose is not water dependent, the Corps will steer the project toward alternatives that do not involve discharges into wetlands.   Indeed, for those projects, the Corps presumes that such alternatives are available.   Once the basic purpose is determined, the Corps analyzes practicable alternatives in light of a project's 'overall purpose,' which is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve."   Florida Clean Water Network, Inc. v. Grosskruger, 587 F. Supp. 2d 1236, 1243 (M.D. Fla. 2008) (citations omitted); see also Alliance for Legal Action v. U.S. Army Corps of Eng'rs, 314 F. Supp. 2d 534, 548-49 (M.D.N.C. 2004) ("Once the Corps determines the water dependency of a project, it no longer considers the 'basic project purpose' but analyzes practicable alternatives 'in light of overall project purposes.'") (citing 40 C.F.R. § 230.10(a)(2)).

As one court has explained, "the definition of a project purpose may not be used by the sponsor as a tool to artificially exclude what would otherwise be practicable alternatives to the project, in other words, the sponsor's project purpose must be 'legitimate.'   Thus, the project purpose may not be defined so narrowly that it make[s] what is [a] practicable [alternative] appear impracticable, yet the Corps cannot ignore a

---

[8] A "water dependent" activity "require[s] access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose."  40 C.F.R. § 230.10(a)(3).

sponsor's genuine and legitimate conclusions regarding the importance of a proposed project." Grosskruger, 587 F. Supp. 2d at 1244 (citing Sylvester v. U.S. Army Corps of Eng'rs, 882 F.2d 407, 409 (9th Cir. 1989)). In defining the project purpose, "not only is it permissible for the Corps to consider the applicant's objective; **the Corps has a duty to take into account the objectives of the applicant's project**. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." Louisiana Wildlife Fed'n, Inc. v. York, 761 F.2d 1044, 1047 (5th Cir. 1985) (emphasis added). Courts have, however, cautioned against defining a project too narrowly. As one court has explained, "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable. The cumulative destruction of our nation's wetlands that would result if developers were permitted to artificially constrain the Corps' alternatives analysis by defining the projects' purpose in an overly narrow manner would frustrate the statute and its accompanying regulatory scheme." National Wildlife Federation v. Whistler, 27 F.3d 1341, 1346 (8th Cir. 1994) (citations omitted). In sum, while "the discretion . . . afforded agencies to define the purposes of a project is not unlimited," courts have "afforded agencies considerable discretion to define the purpose and need of a project." Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066-67 (9th Cir. 1989); Alliance for Legal Action v. F.A.A., 69 Fed. App. 617, 622 (4th Cir. 2003) ("The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable.").

Here, Plaintiffs challenge the "overall project purpose," used to evaluate alternatives, rather than the "basic project purpose," used to determine water dependency.

As they acknowledge, the basic project purpose of "residential housing" was properly determined not to be water dependent.  The problem arose when the Corps defined the overall project purpose as "residential lots along the GIWW," which appeared to transform the project back into a water dependent one, limiting the available alternatives. (A.R. 367.)

Upon considering the arguments, the Court concludes that the overall project purpose of "residential lots along the GIWW," is not overly narrow, and thus not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. First, the Army Corps of Engineers Standard Operating Procedures for the Regulatory Program ("Standard Operating Procedures") specifically provide for the type of narrowing that occurred here.  The Standard Operating Procedures explain:

> **The overall project purpose is more specific to the applicant's project than the basic project purpose**. The overall project purpose is used for evaluating practicable alternatives under the Section 404(b)(1) Guidelines. The overall project purpose must be specific enough to define the applicant's needs, but not so restrictive as to preclude all discussion of alternatives. **Defining the overall project purpose is the responsibility of the Corps, however, the applicant's needs must be considered in the context of the desired geographic area of the development, and the type of project being proposed**.

Army Corps of Engineers Standard Operating Procedures for the Regulatory Program at 7 (1999), available at http://www.saw.usace.army.mil/wetlands/Policies/SOPI.pdf (emphasis added).  Thus, the Corps operated in conformity with its own procedures by making the overall project purpose more specific and defining it both in reference to the Applicant's purpose and the geographic area of the development.  Plaintiffs essentially reject this process; in other words they would like both the basic project purpose and overall project purpose to simply be "residential housing," with no reference whatsoever

to GIWW access.  This is inconsistent with applicable regulations, which specifically provide for the type of narrowing that occurred here.  See id; see also 587 F. Supp. 2d at 1243 ("[A] project's 'overall purpose,' . . . is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve.").

Second, as noted above, Fifth Circuit precedent provides that "the Corps has a duty to take into account the objectives of the applicant's project. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." York, 761 F.2d at 1047.  While the project purpose must not be used as a "tool to artificially exclude what would otherwise be practicable alternatives to the project," it is well established that "the Corps cannot ignore a sponsor's genuine and legitimate conclusions regarding the importance of a proposed project." Grosskruger, 587 F. Supp. 2d at 1244.  The project purpose here recognized the Applicant's legitimate goals in the project, accurately reflected what the Applicant desired to do, and did not artificially exclude practical alternatives.   Indeed, it is understandable and even expected that an important aspect of a housing development along the Texas coast would include access to the Gulf Intracoastal Waterway.  A large part of a developer's purpose in building such a residential development in that area would be to ensure that users of the development are able to access the water.   The Corps thus properly took "into account" the Applicant's objectives in defining the project purpose.[9]

---

[9] As Defendants note in their response, the alternatives analysis was conducted by considering "access to the GIWW," which is not synonymous with "along the GIWW," as GIWW access can be achieved through means other than physical adjacency, such as building a canal.  (D.E. 40 at 6-7.)  The Corps acted in

It is worth noting that, although courts have warned about the dangers of an overly narrow project purpose, in few instances has the Army Corps' project purpose actually been rejected on such grounds.   Rather, in many recent cases, involving multiple different circumstances, the Corps' project purpose definition has been upheld against a challenge that it was overly narrow.  See, e.g., Grosskruger, 587 F. Supp. 2d at 1247-48 ("While there is always the danger that in defining a project purpose, the Corps will simply create a 'self-fulfilling prophecy,' on this record, the Court finds the Corps' decision . . . was neither an abuse of discretion nor arbitrary and capricious."); Nat'l Wildlife Fed. V. Souza, 2009 WL 3667070, at *20 (S.D. Fla. Oct. 23, 2009) ("[T]he Court does not find that the Corps's assessment was inadequate because it was based upon an overly narrow project purpose . . . .  The Court finds the overall project purpose in the 2007 environmental assessment defines the applicants'[] needs without being so unduly restrictive as to preclude practicable alternatives."); Great Rivers Habitat Alliance v. U.S. Army Corps of Eng'rs, 437 F. Supp. 2d 1019, 1026-27 (E.D. Mo. 2006) ("The Corps properly defined the project purpose in accordance with the City's stated development objectives.  The Court cannot conclude that the project purpose was defined in an overly narrow manner merely as a pretense for excluding other alternatives or artificially constraining the Corps' alternatives analysis."); Northwest Env. Defense Ctr. v. Wood, 947 F. Supp. 1371, 1377 (D. Or. 1996) ("In light of the substantial evidence in the record regarding Hyundai's legitimate economic reasons for choosing to construct its project in Eugene, the Corps' decision to restrict the project purpose to 'the Eugene area' was neither arbitrary nor capricious."); see also Whistler, 27 F.3d at 1346 ("The

---

compliance with applicable regulations when it took into account the applicant's more specific overall project purpose in arriving at its definition.

27

cumulative destruction of our nation's wetlands that would result if developers were permitted to artificially constrain the Corps' alternatives analysis by defining the projects' purpose in an overly narrow manner would frustrate the statute and its accompanying regulatory scheme. **We do not believe the case before us raises these concerns**.") (emphasis added).  While one can attempt to distinguish these cases in any number of ways, their cumulative effect demonstrates that an "overly narrow" project purpose is a rare occurrence.

In their Motion, Plaintiffs rely largely upon the dissenting opinion in Sierra Club v. Van Antwerp, 526 F.3d 1353 (11th Cir. 2008) (D.E. 38 at 26), wherein Judge Kravitch stated: "[t]he Corps effectively construed the project's basic purpose as mining *this* limestone out from underneath *these* wetlands. So construed, a conclusion of water-dependency is inevitable. But such a site-specific formulation of a project's purpose could no doubt be formulated for every permit application, and routine acceptance of such formulations would emasculate the wetlands-protecting presumption, defeating its purpose."  526 F.3d at 1367.[10]   While this Court would tend to agree that a project purpose so specifically defined would be arbitrary and capricious, as it effectively eliminates any and all alternatives, the project purpose here is of a different character. The simple reference to the GIWW does not transform a legitimate project purpose into one that is overly narrow.

---

[10] As Plaintiffs note, when this case came up on appeal again, the Eleventh Circuit ruled against the Army Corps, finding a procedural violation.  See 362 Fed. App. 100, 107 (11th Cir. 2010) ("By finding that the project was water dependent, the Corps failed to apply the presumption that practicable alternatives to mining limestone in the Lake Belt are available and did not shift the burden to the Mining Companies to clearly demonstrate that there are no practicable alternatives to mining in the area. See 40 C.F.R. § 230.10(a)(3). This procedural failure by the Corps flaws its subsequent determination regarding the availability of practicable alternatives in violation of its own regulations.").

In addition, while Plaintiffs warn of a "regulatory loophole" created when an applicant is allowed to change a project from water dependent to non-water dependent on the same site, but then requires water accessibility for the non-water dependent project, the Court does not find these concerns warranted.  As discussed further herein, relevant regulations provide "[w]here the activity associated with a discharge which is proposed for a special aquatic site . . . is not 'water dependent' . . . , practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.  In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."  20 C.F.R. § 230.10(a)(3).  Thus, a non-water dependent project seeking a permit must meet a higher burden to demonstrate that a practical alternative is not available; simply because a project is non-water dependent does not mean that it cannot be located along the water.  Rather, if the presumptions are overcome, then a non-water dependent activity may be so located.  Moreover, it is not inconsistent to define the "basic project purpose" as being non-water dependent, but then provide a specific "overall project purpose" taking into consideration the applicant's needs, including the "desired geographic area of the development, and the type of project being proposed."  Standard Operating Procedures at 7.  The Corps acted in compliance with its regulations by defining the overall project purpose in light of the Applicant's stated goals.

In sum, the Corps did not err in its definition of the "project purpose."

### c.    Financial Hardship

In defining the project purpose here, the Corps stated, "[t]he purpose of the modification is to change the purpose of the proposed project from a marine docking facility to waterfront lots for residential lots along the GIWW.  The Applicant stated this will **help relieve the financial hardships incurred during the attempt to construct the marine docking facility** and provide a **return on his investment** in the property."  A.R. 367 (emphasis added).  Plaintiffs argue that Mr. Lack's alleged "financial hardship" is not a proper component of the "project purpose" analysis.  (D.E. 38 at 27-28.)  They state, "relieving the 'financial hardship and providing a return on investment in the property' is not an accepted regulatory rationale."  (D.E. 38 at 28.)  Moreover, Plaintiffs contend that even if financial decisions should be considered, the Corps had no evidence upon which to base any review of financial matters.  (D.E. 38 at 29.)  Defendants respond that it was reasonable to take account of Mr. Lack's financial situation, his investment in the property, and other economic considerations.  (D.E. 40 at 8-9; D.E. 37 at 21-22.)

As an initial matter, the Court does not agree with Plaintiff's characterization that the Corps "allowed the applicant to define the project purpose in relation to his alleged financial hardship."  (D.E. 38 at 27.)   Rather, the Corps merely fulfilled its duty "to take into account the **objectives** of the applicant's project."  York, 761 F.2d at 1048 (emphasis added).  Financial motives, such as a return on an investment, are undoubtedly a common objective behind many or most projects, whether or not stated explicitly.  See, e.g., Alliance for Legal Action, 314 F. Supp. 2d at 549-50 ("[The applicant] would not expend the resources necessary to undertake a project of this size without ensuring that its hub could attract prospective tenants.  [The applicant's] objective in building the cargo hub

was . . . to fulfill the current and future logistical needs of an overnight express air cargo hub, whomever the operator may be. This objective is legitimate."); Grosskruger, 587 F. Supp. 2d at 1245.  It is hardly surprising that an applicant is going through the trouble of the permitting process in order to make money.  Simply recognizing the applicant's financial motives does not undermine the Corps' analysis.  In other words, while part of the "objective" of the project may have been to seek a return on an investment, this was not the project's "purpose."  The Court sees nothing wrong with the Corps' recognition of an applicant's financial objectives.  The Corps' recognition of financial issues is particularly understandable in light of the particular circumstances of this case, specifically the Applicant's prior investment in the Property, his previous filling of wetlands and mitigation work, and his construction of a bulkhead on the Property.  The record reflects Mr. Lack's extensive mitigation efforts, eventually at a 3:1 ratio, which involved planting of spartina alternifloria (cordgrass), maintenance of the site, repeated reports, and numerous interactions with regulators.  (A.R. 18-19; 75; 151; 213; 232-233; 338; 381-382; 393-394.)  The Corps could not properly ignore the Applicant's mitigation efforts when ruling upon the modification.

Plaintiffs rely primarily upon Schmidt v. U.S. Army Corps of Engineers, 2009 WL 579412 (W.D. Mich. 2009) and Smerka v. Glass, 945 F.2d 405 (6th Cir. 1991) to support their position that financial motives should not be considered.  (D.E. 38 at 27-28.) Neither case, however, stands for the proposition that the Corps must ignore the financial objectives of an applicant when reviewing a permit application.   Plaintiffs also reference the Fifth Circuit's decision in York.  (D.E. 38 at 28.)  There, the court discussed the Corps' alternatives analysis, and rejected the argument that the Corps "erroneously

31

granted . . . permits by interpreting 'practicable alternatives' to mean 'profit-maximizing alternatives.'"  761 F.2d at 1047.  The court explained, "[t]he Corps did view the economic feasibility of alternatives, a permissible criterion under both the Environmental Protection Agency's Guidelines and the stated objectives of the permit applicants. However, in granting several of the applications, the alternative selected by the Corps did not allow the applicant to clear the entire tract (the profit-maximizing position) as it had originally requested. . . . . The Corps thus chose alternatives that reduced both the applicants' profit and the economic efficiency of their proposed operations in order to preserve other environmental values."  Id. at 1047-48.  Thus, consistent with applicable regulations governing the alternatives analysis, York merely recognized that economic feasibility of alternatives should be considered.  It does not stand for the proposition that the Corps, in defining the project purpose, must turn a blind eye to an applicant's financial objectives in the proposed development.

Finally, Plaintiffs criticize the Corps for failing to "demand financial data from the applicant and carefully and critically analyze it."  (D.E. 39 at 15-16; see also D.E. 38 at 29.)  Plaintiffs attempt to distinguish the cases upon which Defendants rely by stating that "economic considerations were not the exclusive barometer used to evaluate the respective applications."  (D.E. 39 at 16-17.)   All along, Plaintiffs characterize the Corps as having an "exclusive focus on economic considerations," or "defining the project purpose with sole reference to the applicant's ability to maximize his financial return," thus artificially eliminating other alternatives, namely relocation or restoration.  (D.E. 39 at 17.)   The Court simply disagrees with Plaintiffs' characterization of the record.  The Corps' mere reference to the Applicant's economic motives for the permit modification

32

does not mean that it did not take into consideration other factors. While the Corps must certainly not act as an agent for the applicant to ensure that he or she receives a financial return, this is not what occurred here. Rather, the Corps simply took account of the fact that the applicant was motivated to go through the trouble of seeking a modification so that he could attempt to make a return on his investment. The Corps did not justify its decision based upon that economic motivation.

Moreover, Plaintiffs' assertion that the Corps should have undertaken a detailed review of Mr. Lack's financial representations is simply unfounded. As the Corps notes in its response, an agency "must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation should reflect the significance and complexity of the discharge activity." 40 C.F.R. §230.6(b). The regulations also provide, "[i]t is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment. It generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in such routine cases." 40 C.F.R. §230.6(a). The Corps here was considering a permit modification with respect to property where fill activity and mitigation had already occurred, and would result in little additional impact on the aquatic environment. The record reflects a sufficient review of the Applicant's claims, and the Corps did not abuse its discretion in failing to further investigate the Applicant's economic motivations for the project.

In sum, the Court concludes that the Corps did not err by considering the Applicant's "financial hardship" in its project purpose analysis.

33

### d.    Consideration of Alternatives

The regulations enacted pursuant to Section 404 state that no discharge activities are permitted "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered." Id. § 230.10(a)(2) (emphasis added).  When a basic project purpose is not water dependent and involves discharge into a wetland, two presumptions relevant to the consideration of alternatives apply: "[1] practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise," and "[2] all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."   40 C.F.R. § 230.10(a)(3); 230.3(q-1); 230.41; see Stewart v. Potts, 996 F. Supp. 668, 675 (S.D. Tex. 1998).  "Where the presumption applies, the permit applicant bears the burden of providing detailed, clear, and convincing information proving that an alternative with less adverse impact is impracticable." Sierra Club, 362 Fed. App. at 106.

Plaintiffs challenge the Corps' analysis with respect to both presumptions.

### i.      Alternatives Analysis

Plaintiffs argue that because the Corps defined the "project purpose" so narrowly, it essentially eliminated legitimate practicable alternatives and rendered the alternatives analysis meaningless.  (D.E. 38 at 29-32; D.E. 39 at 18-24.)   Plaintiffs contend, "what undergirds the Corps' analysis is that the project was defined to be water dependent. . . . As a result, any attempts by the Corps to show the feasibility of a non-water dependent parcel . . . will *necessarily* fail."  (D.E. 39 at 20.)  Defendants disagree that the "project purpose" was too narrowly defined, or that they erred in conducting the alternatives analysis.  (D.E. 37 at 20-22.)

As discussed above, the Court disagrees with Plaintiffs' premise that the Corps defined the project purpose too narrowly.  The Court also disagrees with Plaintiffs' contention that the project purpose of housing "along the GIWW" resulted in "an equally narrow list of possible practicable alternatives."  (D.E. 38 at 29.)  The record simply does not bear this out.  Rather, several alternatives were considered, but rejected primarily due to the unique circumstances of this case, namely that the wetlands at issue had already been filled based upon the original permit for the docking facility, mitigation had been performed, and the difficulties in procuring alternative properties or using the current property for a different purpose.

The record shows that the Corps considered four alternatives, and required the Applicant to rebut the necessary presumptions.  First, the "no action alternative," denial of the modification, was rejected because "[t]he applicant has already constructed the mitigation project required as compensation for the wetlands impacts," it would "not allow the applicant to recoup his costs with a successful project even though **no**

**additional impacts** over those already authorized and being mitigated for would occur," and would not "prevent impacts to aquatic resources since fill impacts have already occurred."  (A.R. 368 (emphasis added).)  These conclusions are reasonable in light of the circumstances of this case.

The next alternative ("Alternative 1"), which "would involve the applicant selling the property for a commercial venture by another party," was also considered and rejected.  This was primarily due to the fact that "the street in front of the property has been changed from a public thoroughfare to private land owned by those who own adjacent land," which prevented commercial vehicle access impossible, and makes this alternative "impracticable."  (A.R. 368.)  Once again, the Court sees nothing wrong with this evaluation.  The state judge's decision on the access road is in the record, and it makes little sense to pursue a commercial project without commercial vehicle access.

The next option ("Alternative 2"), relocation of the project (favored by Plaintiffs), was also rejected.  This alternative would involve "relocating the proposed residential development to another site which has the same siting criteria as the project site; GIWW access, market availability, market price, overall tract size capable of supporting at least 6 lots, uplands to wetlands ratio, availability of utilities, and access to public roads and impacts to adjacent property owners."  (A.R. 368.)  The three proposed offsite locations were rejected because they did not meet these criteria.   Importantly, the Corps found that development of the first two properties would "[i]mpact[] . . . the waters of the U.S. **equal or greater** than the fill impacts that were already performed at the preferred site." (A.R. 368-369 (emphasis added).)   Further, while the Corps noted that none of the alternate sites would have "access to the GIWW," it also concluded that each of the three

36

alternative properties would "result in environmental impacts in another location and the likely requirement for additional mitigation," and therefore "none of the identified offsite alternatives **are the least environmentally damaging** practicable alternative for the proposed project." (A.R. 368-369 (emphasis added).) The factors, when considered together, overcome the presumption that practicable alternatives that do not involve special aquatic sites were available. Nothing else fit the properly defined project purpose, and none would have been less environmentally damaging. It was certainly not arbitrary or capricious to reject alternatives that could have been more damaging to the environment then that already done, or those that could not possibly have fulfilled the project's legitimate purpose.[11]

The final option ("Alternative 3") was the Applicant's preferred option of changing the permitted activity to a residential development. The Corps, concluding that "[n]o additional impacts over what is already authorized would occur," and the "applicant is already performing mitigation" for the site, considered this to be the "least environmentally damaging practicable alternative for the proposed project." (A.R. 369.) It was reasonable for the Corps to consider this alternative to be the most viable, given the circumstances. This was not a situation where the Applicant was starting from scratch; rather, he had already filled wetlands on the Property and performed the mitigation work the Corps required. The Corps found that no additional environmental

---

[11] Plaintiffs contend that the Corps rejected the third off-site location solely because boat access to the GIWW would not be possible. (D.E. 39 at 19; D.E. 38 at 29-30.) As noted above, however, the record reflects that the Corps rejected this alternate property not just for this reason, but because it would "result in environmental impacts . . . and the likely requirement for additional mitigation," and thus was not "the least environmentally damaging practicable alternative for the proposed project." (A.R. 369.) There is no reason to doubt the Corps' analysis of the environmental impact of alternatives.

impacts would occur.  It was not an abuse of discretion to find this alternative to be the most viable.

Plaintiffs also advocate a restoration alternative, under which the project could be moved to another site, away from the GIWW, and the existing wetlands could be restored.  (D.E. 38 at 31.)  It is doubtful, however, that this alternative would be "practicable," particularly given the "cost, existing technology, and logistics," 20 C.F.R. § 230.10(a)(2), that would be necessary to restore the wetlands to their pre-project condition.  While certainly those favoring conservation of wetlands would advocate a restoration program, there is no authority for the conclusion that an agency commits error when it rejects such an alternative.  Plaintiffs themselves admit that restoration has generally been ordered in most cases where "the applicant acted in disregard of regulations or the law."  (D.E. 38 at 35.)  Although Plaintiffs have alleged that Mr. Lack acted in violation of the Permit when he advertised a residential development beginning in 2006, the Army Corps investigated this complaint and Mr. Lack agreed to abide by the terms of the Permit.  Mr. Lack was in compliance with Permit 22722's terms when he applied for the modification.  To require restoration at that point may well have been unreasonable.

### ii.    Aquatic Resources

Plaintiffs also contend that the Corps' analysis failed to establish that practical alternatives, with a lesser impact upon aquatic resources, were unavailable.  Under applicable regulations, such a presumption must be rebutted for non-water dependent activity.  (D.E. 38 at 32-36; D.E. 39 at 20-22.)   Defendants contend that their actions complied with applicable regulations.  (D.E. 40 at 15-16.)

Plaintiffs blame the Corps' allegedly deficient consideration of alternatives upon their earlier complaint that the "project purpose" should not have been defined to include GIWW access, which limited the available alternatives.  The Court has already rejected Plaintiffs' claims that the Corps erred in defining the overall project purpose to be "housing lots along the GIWW."  This project purpose was not overly narrow, and did not prevent consideration of viable alternatives.  Moreover, the record demonstrates that the Corps did adequately consider alternatives, and required the Applicant to rebut the presumption of practical alternatives.  For example, an April 27, 2007 email from Thelma Jaynes to Mr. Lack stated, "[b]ased on the fact that the permit was issued for water dependent project and the project you now propose in your change of use not water dependent we need you to submit full alternative analysis looking at other sites that would not require fill in wetlands per the 404(b)(1) guidelines of the Clean Water Act. The change in use is more involved than just modifying language.  Provide location map for all offsite alternatives reviewed and list all criteria you are looking at for viable project and list how each site does or does not meet the criteria."  (AR 036.)  Mr. Lack then responded with his analysis.

The Court has already reviewed the Corps' alternatives analysis above.  The Corps concluded that each of the alternatives would cause a greater environmental impact, and were otherwise impracticable.  The record reflects a consideration of the options, and their rejection for justifiable reasons.  The Court must again reject Plaintiffs' contention that the Corps erred in not considering the possibility of restoration.  (D.E. 38 at 35.)  The Corps certainly did not act arbitrarily or capriciously merely because it rejected this alternative.

The Court also rejects Plaintiffs' contention that it was unreasonable to take into account the fact that the wetlands at issue had already been filled under the authority of the original Permit.  (D.E. 39 at 20.)  It is certainly reasonable take consider the particular circumstances of the case at hand when ruling upon a permit.  Plaintiffs repeatedly claim that Mr. Lack's 2003 Permit is somehow invalid because he all along intended to build residences on the property, rather than a marine docking facility.  Regardless of such allegations, the fact remains that the Corps granted Mr. Lack a Permit, and he acted pursuant to that authority.  It was not arbitrary and capricious for the Corps to take the history of this matter into account when considering the permit modification.

Upon review of the administrative record in this case, the Court finds that the Corps did not err in its alternatives analysis.

### 2.    Compliance with Regulations in 33 C.F.R. Part 320

Plaintiffs also challenge the Corps' adherence to its own regulations, specifically with regard to the requirements of a "public interest" review and consideration of "cumulative impacts."  (D.E. 38 at 36-40.)

### a.    Public Interest Review

The Corp's regulations require, _inter alia_, a "public interest" review, which in turn requires a review of "cumulative impacts."   The regulations relevant to the "public interest" review provide as follows:

> **The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest**. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if

> so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. **All factors which may be relevant to the proposal must be considered including the cumulative effects thereof**: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. **For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines.** Subject to the preceding sentence and any other applicable guidelines and criteria (see §§ 320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

33 C.F.R. § 320.4(a)(1) (emphasis added).  The regulations go on to provide "general criteria" to be considered in evaluating an application.  These are: "(i) The relative extent of the public and private need for the proposed structure or work; (ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and (iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited."  33 C.F.R. § 320.4(a)(2).  The regulations provide much discretion to the Corps in weighing the various factors.  They provide, "[t]he specific weight of each factor is determined by its importance and relevance to the particular proposal. Accordingly, how important a factor is and how much consideration it deserves will vary with each proposal.  A specific factor may be given great weight on one proposal, while it may not be present or as important on another. However, full consideration and appropriate weight will be given to all comments, including those of federal, state, and

local agencies, and other experts on matters within their expertise."   33 C.F.R. § 320.4(a)(3).   The regulations further provide, with respect to the effect upon wetlands, that "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest. . . . "   Id.§320.4(b).

Plaintiffs contend that the Corps conducted a cursory "public interest" review. While the Corps found that Mr. Lack's project would have a positive impact for the Applicant, it did not fully consider negative impacts to neighbors, and the loss of wetlands.  It also did not determine whether the parcel at issue could be sold for a greater or comparable amount to that which Mr. Lack had expended.   (D.E. 38 at 38.) Defendants respond that they properly considered the cumulative impacts of the project, considering the impacts on wetlands, performing the required cumulative impacts analysis, and concluding that such impacts will not be adverse.  (D.E. 40 at 16-17.)

Contrary to Plaintiffs' contentions, the Corps' public interest review was not "cursory."  (D.E. 38 at 38.)  The Corps considered the environmental impacts, including the public interest.  With respect to "historical and cultural resources," it found no historical places in the area, and found the work to be "of such limited nature and scope that little likelihood exists for the proposed project to impinge upon a historic property, even if present within the affected area."  (A.R. 370.)  The Corps also found little impact on water quality, as the "bulkhead has been constructed and all fill work has been completed," and "[n]o lasting water pollution will occur."  (A.R. 370.)  No endangered species were found to be in the area, there would be little impact on fish and wildlife, the aesthetic value would not be negatively impacted, nor would navigation, federal projects,

or safety.  (A.R. 371.)  The Corps considered multiple aspects of the environmental impact of the project, and found it not to warrant denial of the application.  Merely because Plaintiffs disagree with this analysis does not mean that it was arbitrary and capricious.

The Corps specifically considered letters from the public, including those from Mr. Eppright and Mr. Moseley, "stating that the original permit should never have been issued and when issued it was granted on misinformation and untruths." (A.R. 376.)  The Corps explained:

> Although the permit was originally issued for water-dependent project that does not mean permit would never be issued for non-water dependent project, only that it would need to be properly evaluated and be the least environmentally damaging practicable alternative available and capable of being done after taking into consideration cost existing technology and logistics in light of the overall project purpose.  **Based on our review we find that the change in use proposed along with the continued monitoring of the mitigation site and the addition of the seagrass surveys will not have more than minimal adverse impact on the surrounding areas of the GIWW or on the fish and wildlife resources.** No other impacts have been identified that would preclude issuance of this permit. (A.R. 380 (emphasis added).)

Again, there is nothing improper about the Corps' consideration of the public's comments, nor its findings of no additional environmental impact.

### b.  Analysis of Cumulative Impacts

Plaintiffs also argue that the Corps failed to fairly analyze cumulative impacts, required under 33 C.F.R. § 320.4(a)(1), which includes "reasonably foreseeable future actions."  The Corps must also balance the benefits of the proposed project against its detriments.  Plaintiffs contend that the Corps did not consider the impact of the "loophole" it had created (ie, describing a project as non-water dependent, but defining the project purpose in relation to water accessibility).  Plaintiffs argue that the loophole

will "lead to significantly heavier concentrations of structure and human activity along the Texas coast," but the Corps did not consider whether over-development of the coastal region is in the public interest.  (D.E. 38 at 39.)   Plaintiffs fear that other similar projects may arise in the future if this one is allowed to proceed – they thus focus not on the cumulative impact of the wetlands filled here (less than one acre) but upon the cumulative impact caused by the "loophole."  Because such impacts were not considered, the Corps' decision violated its own regulations, they contend.  (D.E. 38 at 38-40.)

Because this Court has already concluded that no loophole has been created, the Corps did not err in failing to consider its consequences.   Moreover, the record demonstrates that the Army Corps did in fact properly consider the "cumulative impacts." The Corps considered both past and present actions in the area.  With respect to past actions, the Corps concluded:

> The work authorized since the inception of this database appears to be for one permit to drill two oil and gas wells and construct two well pads in State Tract 94 and four authorizations that authorized two covered boatlifts three length extensions for existing piers boat stall with minimal dredging and an extension of time to conduct work on the boat stall.

> Past actions within the review area also include maintenance and operations actions associated with the Matagorda Ship Channel and GIWW federal navigation projects.  Kingfisher Beach which lies on the shoreline of Matagorda Bay in Port O'Connor was developed to provide site for beneficial use of dredged material.  (A.R. 373.)

Present actions included Permit 22348, which involved "the fill of 0.24 acres of open waters, 0.02 acres of wetlands, and the excavation of 1.91 acres of open water during the construction of a canal subdivision consisting of single family residential lots," with modifications resulting in "additional placement fill of 0.14 acres of wetlands and temporary impacts to 0.35 acre of the total remaining 0.63 acre of wetlands on the tract."

44

Mitigation for this site included "enhancement of a 0.70 acre wetland and avoidance of a 0.15 acre wetland." Other actions included enhancement to the Matogorda Ship Channel Navigation Project, and the Corps anticipated "additional permit applications," would result in "heavier concentrations of structures and human activity in the area." The Corps concluded, "[w]hen considering the overall impacts that will result from this project in context with the overall impacts from similar past present and reasonably foreseeable future projects their cumulative impacts are not considered to be significantly adverse. It is likely we will receive similar projects in the future which will go through comparable review process." (A.R. 373-374.) The Corps conducted an adequate cumulative impacts analysis, and its decision is not vulnerable on this ground.

### 3.    National Environmental Policy Act

Plaintiffs' Complaint alleges that Defendants violated NEPA by failing to consider the "cumulative impacts" of the project. (D.E. 30 at 18-19.) As explained above, Plaintiffs complain that the Corps' actions created a "loophole in the regulatory structure designed to protect wetlands," which if allowed to continue would result in the loss of "substantial additional acreage of wetlands." The Corps should have analyzed these impacts. (D.E. 30 at 18.) Plaintiffs also contend that the alternatives analysis under NEPA was inadequate. (D.E. 30 at 16.) Plaintiffs do not, however, move for summary judgment on NEPA grounds specifically; rather the Defendants do. (D.E. 37 at 28-35.) The Court reviews the applicable law, then considers the parties' arguments.

### a.    Applicable Law

The purpose of NEPA is to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment," and its primary

intent is to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States.   42 U.S.C. § 4321.[12]   As the Supreme Court has explained, "NEPA itself does not mandate particular results" in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."   Dep't of Transport. v. Public Citizen, 541 U.S. 752, 756-57 (2004) (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989)).   NEPA sets out "action-forcing procedures that require that agencies take a 'hard look' at environmental consequences." Robertson, 490 U.S. at 350.

NEPA's primary requirement is contained in Section 4332, which requires that federal agencies:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
>
> > (i) the environmental impact of the proposed action,
> >
> > (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> >
> > (iii) alternatives to the proposed action,
> >
> > (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> >
> > (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

---

[12] NEPA is applicable only to "major federal actions," and the "issuance of a section 404 permit is considered a major federal action."   42 U.S.C. § 4332(2)(C); Tillamook County v. U.S. Army Corps of Eng'rs, 288 F.3d 1140, 1142 (9th Cir. 2002).

42 U.S.C. § 4332(2)(C).  This detailed statement is commonly referred to as an Environmental Impact Statement ("EIS").  The Council of Environmental Quality ("CEQ"), established by NEPA, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement.  See 40 CFR § 1500.3 (2003).  "The CEQ regulations allow an agency to prepare a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS. The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].' If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  Public Citizen, 541 U.S. at 757-58 (quoting 40 C.F.R. §§ 1500.3; 1501.4(a)-(b); 1508.9(a); 1501.4(e); 1508.13)).  Thus, "[t]o determine whether an EIS is necessary, an agency will perform an EA."  City of Dallas, Tex. v. Hall, 562 F.3d 712, 717 (5th Cir. 2009).  An EA is "a rough cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement - which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project - is necessary."  Id.

An agency's decision not to prepare an EIS can be set aside only upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Public Citizen, 541 U.S. at 763.

Similar to the CWA, NEPA requires agencies to conduct an analysis of alternatives and cumulative impacts.   See, e.g., Ohio Valley Envtl. Coalition v. Aracoma Coal Co., 556 F.3d 177, 207 (4th Cir. 2009) ("Under both NEPA and the CWA, the Corps is required to consider the cumulative impacts of an applicant's proposed project."); Sierra Club, 526 F.3d at 1368 n.6 ("[T]he Corps' regulations contemplate that the alternatives analysis in NEPA documents will also provide the basis for practicable alternatives analysis under the CWA."); Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1163 (10th Cir. 2002) ("For actions subject to NEPA, the analysis of alternatives required for the NEPA environmental documents will in most cases provide the information for the evaluation of alternatives under the CWA Guidelines.").

**b.    Analysis**

**i.    Consideration of Alternatives**

Defendants first contend that they properly considered a full range of alternatives, in the context of NEPA.   They conducted the alternatives analysis in the EA, and ultimately determined that the Applicant's proposal was the best option.   They also considered the "no action" alternative.  (D.E. 37 at 30-31.)   Plaintiffs respond that the Corps did not conduct the necessary "hard look" required by NEPA because it did not properly consider cumulative impacts or alternatives.  The primary reason for the Corps' failure, Plaintiffs contend, was that the project purpose was defined too narrowly, as argued elsewhere.  (D.E. 39 at 24-25.)

It is well established that the alternatives analysis pursuant to an EA is more limited then that pursued in an EIS.[13]  Applicable regulations provide that an EA shall "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  The Fifth Circuit has recently explained, "[a]n EA must discuss alternatives to the planned action, but need **not discuss all proposed alternatives**. The range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial.  **The rejection of even viable and reasonable alternatives, after an appropriate evaluation, is not arbitrary and capricious**."  Hall, 562 F.3d at 718 (citations omitted; emphasis added).  While "the relevant regulation [§ 1508.9(b)] does mandate the discussion of alternatives, the regulation does not require that *all* proposed alternatives, no matter their merit, be discussed in the EA."  Louisiana Crawfish Producers Ass'n - West v. Rowan, 463 F.3d 352, 356-57 (5th Cir. 2006).

The Court has already discussed the Corps' consideration of alternatives above, in the context of the Section 404(b)(1) guidelines.  None of the alternatives were deemed better given the facts of this case.  Simply because Plaintiffs believe another alternative was preferable or better does not make the Corp's decision arbitrary and capricious.  Hall, 562 F.3d at 718.  Plaintiffs' argument as to alternatives must fail.

### ii.    Cumulative Impacts

Plaintiffs have also contended that the Corps' cumulative impacts analysis pursuant to NEPA was insufficient.  (D.E. 39 at 25.)  Defendants disagree, and state that they have properly analyzed the cumulative impacts of the project.  (D.E. 37 at 32-35.)

---

[13] Plaintiffs do not argue that the Corps erred in deciding against producing a full EIS.

Regulations enacted pursuant to NEPA require agencies to consider the cumulative impacts of a project on the environment.   40 C.F.R. § 1508.7, 1508.25; O'Reilly v. U.S. Army Corps of Eng'rs, 477 F.3d 225, 234 (5th Cir. 2007).   The "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions.   Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."   40 C.F.R. § 1508.7.[14]

The Courts find no error with the Corps' cumulative impacts review.   As noted above, the Corps did not err by defining the project purpose in relation to water accessibility even though it was for a non-water dependent activity.   Moreover, the record, as summarized above, demonstrates the necessary review of the project and alternatives in all of the EA/SOFs produced in this matter.   Plaintiffs' contention that the Corps' cumulative impacts review was deficient merely because it did not undertake a review of the impact of the Corps' own allegedly wrongful interpretation of Section 404(b)(1) guidelines first requires the conclusion that the Corps did in fact err in its interpretation.   Plaintiffs have not demonstrated this to be so.

Moreover, the Court finds no error with the Corps' recognition of further development along the Texas coast.   The Corps recognized the possibility of future permits, but concluded "[w]hen considering the overall impacts that will result from this

---

[14] In the past, the Fifth Circuit has stated that the cumulative impacts analysis requires consideration of: "(1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions-past, proposed, and reasonably foreseeable-that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate."   Fritiofson v. Alexander, 772 F.2d 1225, 1245 (5th Cir. 1985).

project in context with the overall impacts from similar past, present, and reasonably foreseeable future projects, their cumulative impacts are not considered to be significantly adverse."  (A.R. 374.)  There is no specific reason to believe that the Corps erred in its conclusion as to the impact of developments along the Texas coast.  The Court concludes that Defendants did not act in an arbitrary or capricious manner under NEPA.

In sum, the Court finds that the Corps did not act in an arbitrary and capricious manner, or abuse its discretion, or otherwise act not in accordance with the law.  The Corps properly and reasonably exercised its authority under the CWA, NEPA, and applicable regulations.

## V.    Conclusion

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED (D.E. 38) and Defendants' Motion for Summary Judgment is GRANTED (D.E. 37).

SIGNED and ORDERED this 15th day of March, 2011.

Janis Graham Jack
United States District Judge